

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE TORRES

CHINA SHIPPING CONTAINER LINES CO. LTD.,

         Petitioner,

        -against-

BIG PORT SERVICE DMCC,

         Respondent.

Civ. No. _____

RECEIVED
MAR 17 2015
U.S.D.C. S.D.N.Y.

## PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO TEMPORARILY RESTRAIN AND PRELIMINARILY ENJOIN ARBITRATION

HOLLAND & KNIGHT LLP
31 West 52nd St.
New York, NY 10019
Telephone: (212) 513-3200
Telefax: (212) 385-9010
michael.frevola@hklaw.com
blythe.daly@hklaw.com

*Attorneys For Petitioner*
*China Shipping Container Lines Co. Ltd.*

*Counsel.*

Michael J. Frevola, Esq.
K. Blythe Daly, Esq.

#34355236_v2

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF FACTS .................................................................................... 1

    A.    The Bunkering of the Vessel ...................................................................... 1

    B.    The OW Bunker Group Bankruptcies ........................................................ 4

    C.    Big Port's Claims Against CSCL and the Singapore Proceedings ............. 4

    D.    Big Port's New York Arbitration Demand ................................................ 5

ARGUMENT ......................................................................................................... 8

I.      CSCL WILL BE IRREPARABLY HARMED IF IT IS FORCED TO ARBITRATE ....... 9

II.    CSCL IS LIKELY TO PREVAIL ON THE MERITS ............................................ 9

    A.    CSCL Is Not a Signatory to an Agreement to Arbitrate With Big Port ........... 9

    B.    CSCL Cannot Be Bound as a Non-Signatory to an Arbitration Agreement That Big Port Might Have With Another Party ...................................... 10

          1.    Incorporation by Reference .............................................................. 10

          2.    Assumption ....................................................................................... 10

          3.    Veil-Piercing/Alter Ego .................................................................... 11

          4.    Estoppel ............................................................................................ 11

          5.    Agency .............................................................................................. 13

               a.    Agency Law .......................................................................... 13

               b.    Big Port's Demand For Arbitration and Purported Agency Claim ................................................................................ 14

               c.    Agency Analysis ................................................................... 18

CONCLUSION .................................................................................................... 19

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Fidelity & Guar. Ins. Co. v. West Point Realty, Inc.*,
No. 02 Civ. 1951 (LMM), 2002 WL 1933780 (S.D.N.Y. Aug. 21, 2002) ............................12

*Ford v. Unity Hospital*,
32 N.Y.2d 464, 346 N.Y.S.2d 238 (1973) ...........................................................................19

*Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.*,
909 F.2d 698 (2d Cir. 1990)...............................................................................................15

*Merrill Lynch Inv. Mgrs. v. Optibase, Ltd.*,
337 F.3d 125 (2d Cir. 2003).......................................................................................8, 10, 14

*Shaw Group, Inc. v. Triplefine Int'l Corp.*,
No. 01 Civ. 4273, 2001 WL 883076 (S.D.N.Y. Aug. 3, 2001), *vacated in part
on other grounds*, 322 F.3d 115 (2d Cir. 2003) ...................................................................12

*Stolt-Nielsen Transp. Group B.V. v. Edible Oil Trading Corp.*,
No. 06 Civ. 0703 (NRB), 2007 WL 194182 (S.D.N.Y. Jan. 24, 2007) ...........................11, 12

*Thomson−CSF, S.A. v. Am. Arbitration Ass'n*,
64 F.3d 773 (2d Cir. 1995)......................................................................................8, 11, 12, 13

*Wilhelmsen Premier Marine Fuels AS v. UBS Provedores Pty Ltd.*,
519 F. Supp. 2d 399 (S.D.N.Y. 2007)....................................................................................2

## PRELIMINARY STATEMENT

Petitioner China Shipping Container Lines Co. Ltd. ("CSCL") moves this Court for an order staying arbitration demanded by Respondent Big Port Service DMCC ("Big Port") relating to Big Port's claim for bunkering services, and respectfully submits that the following issue is presented by CSCL's motion:

> A court should enjoin an arbitration from going forward if the party resisting arbitration can show irreparable harm and a likelihood of success on the merits. Irreparable harm exists if a party is forced to arbitrate when it has not agreed to do so. There is no agreement to arbitrate here between CSCL and Big Port, and Big Port's claim of agency relies solely on the actions of the purported agent. Should this Court grant CSCL's preliminary injunction application?

CSCL respectfully submits that the answer to the foregoing question is "yes," and that this Court should issue an order staying the arbitration demanded by Big Port.

## STATEMENT OF FACTS

**A.      The Bunkering of the Vessel**

On or about August 27, 2014,[1] CSCL contacted OW Bunker China Limited ("OWB China") by e-mail to obtain a delivery of bunker fuel oil to the *M/V XIN CHANG SHU* (the "Vessel"). Decl. of Qiao Qiming dated March 13, 2015 ("QQ Decl."), ¶ 5. Several e-mails were exchanged between CSCL and OWB China, which correspondence culminated in a contract by which OWB China committed to supply 4,000 metric tons of fuel oil to the Vessel at Kavkaz, Russia. *Id.* ¶¶ 4-5 & Exs. 1, 2. At the conclusion of the e-mails, OWB China memorialized its agreement with CSCL through a Sales Confirmation (the "OWB China Sales Confirmation") dated September 26, 2014, which recited the agreed price for the CSCL/OWB China bunker agreement as US$469.00 per metric ton. *Id.* ¶ 5. The OWB China Sales Confirmation further

---

[1] All date references herein are for 2014 unless otherwise indicated

states that fuel sales are subject to OW Bunker Group's Terms and Conditions provided on its website. *Id*

As is common in the bunkering industry, OWB China did not bunker the Vessel itself but rather arranged to have a local supplier perform the physical delivery to the Vessel. *Id* ¶ 6.[2] In this case, OWB China entered into a contract with OW Bunker Far East (Singapore) Pte Ltd. ("OWB Far East") for the purchase of 4,000 metric tons of bunkers to be supplied to the Vessel *Id* OWB China and OWB Far East are separate and independent legal entities − both of which are wholly-owned subsidiaries of their Danish parent OW Bunker Trading A/S − and are primarily involved in the business of bunker trading and supply. *Id*

The contract between OWB China and OWB Far East (the "OWB China/OWB Far East Contract") provided that OWB Far East agreed to sell and OWB China agreed to purchase the bunkers at US$445 00/metric ton. *Id* ¶ 7 & Ex 5   At the time when the OWB China/OWB Far East Contract was agreed, CSCL was unaware of this contract between OWB China and OWB Far East *Id* ¶ 7   Prior to January 7, 2015, on which date CSCL's Singapore counsel received copies from OWB Far East's liquidators, CSCL had neither seen nor received OWB Far East's Sales Order Confirmation or Tax Invoice issued by OWB Far East to OWB China  *Id*

OWB Far East, in turn, contracted with Big Port to arrange the physical supply to the Vessel  *Id* ¶ 8  On September 25, Big Port issued a Bunker Sales Confirmation to OWB Far East for provision of 4,000 metric tons of fuel oil to the Vessel (the "OWB Far East/Big Port

---

[2] The process is described by Judge McMahon of this District in a decision issued several years ago

> Wilhelmsen did not use its own employees and services to physically supply the bunkers that were requested by UBS for the nominated vessel        Instead, as is apparently common in the bunkering industry, Wilhelmsen used a local supplier to physically supply the vessel in accordance with its instructions        In doing so, Wilhelmsen contracted with a local supplier, Sumitomo, to carry out the requested bunkering operations

*Wilhelmsen Premier Marine Fuels AS v  UBS Provedores Pty Ltd* , 519 F  Supp  2d 399, 402 (S D N Y  2007) (internal record citations omitted)

Contract"). *Id.* & Ex. 6.   The agreed price for the OWB Far East/Big Port Contract was US$442.00 per metric ton. *Id.* & Ex. 7.   The Bunker Sales Confirmation states that Big Port:

> [S]hall have right to take any legal actions before the courts in any country to a) pursue the merits of a claim against the Owners/Buyers before any Court or by New York arbitration clause of 15(b) of Bimco Standard Bunker Contract[, or] (b) as interim measure of protection in order to securing payment of any amount due from the owners/buyers against the vessel.

*Id.*, Ex. 6.   The Bunker Sales Confirmation further states that "All other terms in accordance with Sellers' General Terms and Conditions of Sale." *Id.*   Clause 18 of Big Port's General Terms and Conditions of Sale ("GT&Cs") states:

> Should any dispute arise out of this Agreement, the dispute shall be referred to a three person arbitration panel in the City of New York, one person to be appointed by each of the parties hereto, and the third person by the two so chosen: their decision or that of any two of them shall be final . . . .

*See id* ¶ 15 (GT&Cs provided as part of Big Port's e-mail attachments to CSCL).

On September 30, OWB Far East issued to Big Port a Purchase Order Confirmation for the delivery of 4,000 metric tons of fuel oil to the Vessel between October 13 and October 17 at the port of Kavkaz, for the account of OWB Far East. *Id.* ¶ 8 & Ex. 7.

On November 1, a Bunker Delivery Receipt was issued by a barge which supplied the Vessel a portion of the bunkers. *Id.* ¶ 10 & Ex. 8.   On November 2, another Bunker Delivery Receipt was issued by another barge which supplied the Vessel with the remainder of the bunkers. *Id* ¶ 10 & Ex. 8.

OWB China invoiced CSCL for delivery of bunkers to the Vessel by invoice dated November 1 in the amount of $1,876,000. *Id* ¶ 11 & Ex 9.   This invoice was due and payable to OWB China within 30 days from the date of supply (i.e., by December 1). *Id*

Similarly, OWB Far East issued to OWB China its invoice dated November 1 in the sum of US$1,780,000 for the bunkers supplied under the OWB China / OWB Far East Contract. *Id* ¶

12 & Ex 10.  This invoice was due and payable to OWB Far East by November 20.  *Id.* ¶ 12 & Ex 10.

On November 2, Big Port invoiced OWB Far East for the delivery of the bunkers in the amount of $1,768,000.  *Id.* ¶ 13 & Ex 11.

**B.     The OW Bunker Group Bankruptcies**

On or about November 7, OW Bunker Trading A/S, the parent company of OWB China, was declared bankrupt in Denmark.  *Id.* ¶ 14 & Ex 12.  On or about November 12, OWB Far East commenced voluntary winding-up proceedings in Singapore and appointed KPMG as their provisional liquidators.  *Id.* ¶ 15 & Ex 13.  On November 21, OWB China commenced winding up proceedings in Hong Kong, and pursuant to an Order of Court dated November 21, KPMG was appointed as provisional liquidators of OWB China.  *Id.* ¶ 16 & Ex 14.

**C.     Big Port's Claims Against CSCL and the Singapore Proceedings**

On November 12 − i.e., the same date on which OWB Far East commenced voluntary winding up proceedings − Big Port contacted CSCL by e-mail seeking payment for its invoice demanding payment in the sum of US$1,768,000.  *Id.* ¶ 17 & Ex 15.  The legal basis relied upon by Big Port in its demand for payment from CSCL was that the bunkers were supplied on the credit of the Vessel and that Big Port had a lien on the Vessel as a consequence.  *See id.*

On November 24, CSCL's Singapore counsel advised Big Port's Singapore counsel that OWB Far East was not CSCL's agent.  Decl. of Koh See Bin dated March 13, 2015 ("Koh Decl."), ¶ 7 & Ex. 1.  The following day, CSCL's Hong Kong counsel expressly told Big Port's Singapore counsel that OWB Far East was not CSCL's agent and further advised that CSCL had contracted with OWB China.  *Id.* ¶ 8 & Ex. 2.  As part of this correspondence, CSCL's counsel provided to Big Port's counsel the OWB China Bunker Order Confirmation showing that the

price per metric ton of the CSCL/OWB China bunker agreement was different than the price of the OWB Far East/Big Port agreement. *Id.*

On or about December 10, Big Port arrested the Vessel in Singapore. *Id.* ¶ 9. In order to secure the Vessel's release, CSCL paid the sum of US$2.6 million into the Singapore Court. *Id.* ¶ 10. The Vessel was released on December 12. *Id.*

On or about December 19, Big Port applied to the Singapore Court to stay the Singapore proceedings pending arbitration. *Id.* ¶ 11. On or about December 30, CSCL filed an application to set aside the arrest and/or to strike out Big Port's claim in Singapore on the basis that there is no contract between CSCL and Big Port. *Id.*

On December 30, in response to an inquiry by CSCL's Singapore counsel, OWB Far East's provisional liquidators informed CSCL's counsel that OWB Far East had contracted with Big Port as principals. *Id.* ¶ 14 & Ex. 5. OWB Far East's provisional liquidators further reported that OWB Far East had contracted with OWB China as evidenced by Sales Order Confirmation dated September 30, 2014, a copy of which was provided to CSCL's Singapore counsel. *Id.* OWB China subsequently confirmed the separate contract between OWB Far East and OWB China by correspondence dated January 7, 2015. *Id.* ¶ 16 & Ex. 7.

The pending motions were part heard by the Singapore High Court on March 6, 2015, and a further is scheduled for March 24, 2015. *Id.* ¶ 11.

**D.    Big Port's New York Arbitration Demand**

On December 14, Big Port served on CSCL its Demand for Arbitration in New York for Big Port's claim concerning the bunkers provided to the Vessel. QQ Decl. ¶ 19 & Ex. 16. Big Port named Charles Donovan as its party-appointed arbitrator. *Id.*

On January 5, 2015, CSCL's U.S. counsel advised Big Port's U.S. counsel that it would not appoint a second arbitrator while the applications were pending before the Singapore courts. Decl. of Michael J. Frevola dated March 16, 2015 ("Frevola Decl."), ¶ 5 & Ex. 3.

On January 13, 2015, Big Port appointed Jay Paré as CSCL's party-appointed arbitrator. *Id.* ¶ 6 & Ex. 4. That same day, CSCL objected to the appointment of Mr. Paré on the basis that CSCL did not agree to arbitrate a dispute with Big Port and pointed out that Big Port had raised the issue of arbitrability before the Singapore Court. *Id.* ¶ 6 & Ex. 5.

On January 15, 2015, Mr. Donovan wrote to counsel as follows:

> I have discussed with Mr. Paré his appointment as a second arbitrator by Mr. Simms, attorney for claimant, Big Port Service DMCC, and also Mr. Frevola's objection to that appointment on the grounds that his client, China Shipping Container Lines Co. Ltd., did not agree to arbitrate, is therefore not in default, and hence Mr. Simms has no right to appoint Mr. Paré as a second arbitrator. From the exchange of messages we have seen, Mr. Paré and I understand that courts in Singapore and possibly New York will decide the threshold issue of China Shipping's obligation to arbitrate. We therefore think we should take no action to appoint a chairperson or otherwise proceed with the arbitration unless and until both counsel agree that we should act or there is a judicial determination of these outstanding issues. Should either side disagree with that approach, please respond and provide a simultaneous copy of your response to opposing counsel. . . .

*Id.* ¶ 7 & Ex. 6. In response to Mr. Donovan's e-mail, Big Port's U.S. counsel wrote as follows:

> Big Port disagrees. CSCL has declined to appoint an arbitrator in response to due demand, and the arbitration provision does apply to CSCL. Big Port has disputed in the High Court (Singapore) and will continue to dispute, CSCL's rejection of its arbitration obligation. The SMA Rules contemplate exactly this situation, which is why they permit, in this situation, the appointment of a second arbitrator on the respondent's refusal to appoint. The SMA Rules – and arbitration proceedings under the SMA Rules – do not turn on whether the refusing party contests an arbitration clause. If they did, no SMA arbitration ever would occur, short of court process. That is not what the SMA Rules compel, including here.
>
> As far as deciding whether the issue is arbitral in the first place, Big Port further understands, that the question does not lie with the arbitral panel. If, once constituted and the arbitral proceedings underway, a court should declare that there should be no arbitration, then, Big Port will respond to that, however, that should not affect whether the arbitration should proceed.

> Big Port understands, however, that you both may not believe that given the
> circumstances as perceived, you can proceed as arbitrators. If that is incorrect,
> please proceed to appoint the chairman and proceed with the arbitration. Please
> confirm by 5P US East Coast Time tomorrow, 16th January, that you both will
> proceed. Without that confirmation Big Port accepts that you have resigned the
> appointments.

*Id.* ¶ 8 & Ex. 7.  On January 16, 2015, Mr. Paré withdrew as arbitrator. *Id.* ¶ 9 & Ex. 8.  CSCL's

New York counsel did not receive any notification that Mr. Donovan withdrew as Big Port's

party-appointed arbitrator. *Id.* ¶ 10.  Attempts by CSCL's New York counsel to reach Mr.

Donovan were unanswered. *Id.*

On January 21, 2015, Big Port appointed Neil Klein and Alan Nakazawa as Big Port and

CSCL's new arbitrators, respectively. *Id.* ¶ 11 & Ex. 9.  Mr. Nakazawa − who had sought a

waiver from CSCL to act as arbitrator because of his prior representation of CSCL − withdrew

when he could not obtain CSCL's waiver on his serving as an arbitrator. *Id.* ¶ 12 & Ex. 10.

On February 4, 2015, Big Port's U.S. counsel nominated Mitch Griffin as yet another

arbitrator for Big Port's demanded arbitration. *Id.* ¶ 13 & Ex. 11.  CSCL's counsel once again

objected to the arbitrability of Big Port's claim against CSCL. *Id.* ¶ 14 & Ex. 12.

On February 13, 2015, Mr. Klein wrote to report that the two arbitrators had appointed

Mr. Donovan − Big Port's original nominee as its own arbitrator − as the panel chairman. *Id.* ¶

15 & Ex. 13.  On February 23, 2015, Mr. Donovan wrote to counsel for Big Port and CSCL

setting March 3, 2015 as the date of the initial arbitration hearing for scheduling and other

matters, including but not limited to the issue of whether the arbitrators have jurisdiction to

determine whether CSCL is bound by the Big Port arbitration clause. *Id.* ¶ 16 & Ex. 14.

On March 3, 2015, the arbitrators conducted their first hearing and directed briefing on

whether they have jurisdiction to determine their own jurisdiction. *Id.* ¶ 17 & Ex. 15.

## ARGUMENT

The Second Circuit, relying on Supreme Court precedent has made clear that a party cannot be compelled to arbitrate a claim which it has not agreed to arbitrate:

> Arbitration is contractual by nature – "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). Thus, while there is a strong and "liberal federal policy favoring arbitration agreements," *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985) (quotations omitted), such agreements must not be so broadly construed as to encompass claims and parties that were not intended by the original contract.

*Thomson–CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995).

If a claimant seeks to force a party to arbitrate a claim which is not subject to arbitration, it is appropriate for a federal district court to issue a preliminary injunction staying the arbitration followed by a declaration that the parties' dispute is not arbitrable. *See Merrill Lynch Inv. Mgrs. v. Optibase, Ltd.*, 337 F.3d 125, 132 (2d Cir. 2003) (affirming district court's grant of preliminary injunction staying arbitration against non-signatory to arbitration agreement); *see also Thomson-CSF*, 64 F.3d at 775 (reversing district court's refusal to grant declaratory and injunctive relief to non-signatory to arbitration agreement).

A party seeking a preliminary injunction in connection with staying arbitration has the burden to show: "(1) that it will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of the hardships tipping decidedly in its favor." *Optibase*, 337 F.3d at 129 (quoting *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 348-49 (2d Cir. 2003)).

Here, as discussed below, CSCL did not enter into any contract with Big Port, much less a contract to arbitrate any disputes with Big Port. While Big Port seeks to bootstrap its position

into contractual privity with CSCL, the documentation recording the bunkering transactions at issue demonstrates that Big Port's position is incorrect as a matter of law and fact. Because there is no ground by which Big Port should be able to require CSCL to arbitrate, CSCL is entitled to a preliminary injunction staying the arbitration commenced by Big Port.

## I.    CSCL WILL BE IRREPARABLY HARMED IF IT IS FORCED TO ARBITRATE

As a matter of law, a party will suffer irreparable harm if it is required "to expend time and resources arbitrating an issue that is not arbitrable, and for which any award would not be enforceable." *Optibase*, 337 F.3d at 129 (quoting *Maryland Casualty Co. v. Realty Advisory Bd. on Labor Relations*, 107 F.3d 979, 985 (2d Cir. 1997)). Here, CSCL would suffer this very type of irreparable harm if it was required to participate in the arbitration demanded by Big Port (or if it had to seek to vacate any award obtained by Big Port). Hence, this Court should hold that CSCL has demonstrated that it will suffer irreparable harm.

## II.   CSCL IS LIKELY TO PREVAIL ON THE MERITS

### A.    CSCL Is Not a Signatory to an Agreement to Arbitrate With Big Port

The accompanying declarations and documents show that CSCL contacted OWB China on August 27, 2014 regarding bunkering the Vessel, after which OWB China responded to CSCL with its "Sales Confirmation" dated September 26, 2014. The e-mail string annexed to the Qiao Declaration as Exhibit 1 is the totality of correspondence between CSCL and OWB China regarding the purchase of the bunkers. As can be seen, the last e-mail in that e-mail string – an e-mail from Lexie Li of OWB China to Qiao Qi Ming of CSCL dated September 26, 2014 – attached a PDF file, which was the OWB China "Sales Confirmation" dated September 26, 2014, a document that is two pages long and has no mention of an arbitration clause. *See* QQ Decl., Ex. 2. That document is the sole contractual document provided to CSCL with respect to the bunkering of the Vessel. Hence, CSCL did not expressly agree to arbitrate with Big Port because

the documentation received by CSCL from OWB China relating to the bunkering of the Vessel did not expressly refer to an arbitration agreement with Big Port. *See, e.g., Stolt-Nielsen Transp. Group B.V. v. Edible Oil Trading Corp.*, No. 06 Civ. 0703 (NRB), 2007 WL 194182, at *3 (S.D.N.Y. Jan. 24, 2007) (holding defendant was not party to contract containing arbitration clause because defendant was not listed in the contract containing the arbitration agreement).

**B.    CSCL Cannot Be Bound as a Non-Signatory to an Arbitration Agreement That Big Port Might Have With Another Party**

While a party cannot be compelled to arbitrate unless it has entered into an agreement to do so, courts have recognized several theories by which non-signatories may be bound to the arbitration agreements of others. *See, e.g., Thomson–CSF*, 64 F.3d at 776. These theories arise out of common law principles of contract and agency law: 1) incorporation by reference; 2) assumption; 3) veil-piercing/alter ego; 4) estoppel; and 5) agency. *Id.* None of these theories provide Big Port with any comfort here. In examining whether a non-signatory should be bound to an agreement to arbitrate, this Court cannot bind a non-signatory unless "the totality of the evidence supports an objective intention to agree to arbitrate." *Stolt-Nielsen*, 2007 WL 194182, at *3 (quoting *Sarhank Group v. Oracle Corp.*, 404 F.3d 657, 662 (2d Cir. 2005)).

1.    **Incorporation by Reference**

The "Sales Confirmation" dated September 26, 2014 issued by OWB China contains no reference to Big Port's GT&Cs. Hence, the incorporation by reference theory is inapplicable.

2.    **Assumption**

The assumption theory requires a party to assume the obligations of an already-existing contract containing an arbitration clause. *See, e.g., Fidelity & Guar. Ins. Co. v. West Point Realty, Inc.*, No. 02 Civ. 1951 (LMM), 2002 WL 1933780, at *4-5 (S.D.N.Y. Aug. 21, 2002) (plaintiff which issued performance bond and later took over its insured's obligations under

contract containing arbitration agreement was bound by that arbitration agreement); *Shaw Group, Inc. v. Triplefine Int'l Corp.*, No. 01 Civ. 4273, 2001 WL 883076, *1-2 (S.D.N.Y. Aug. 3, 2001) (holding non-party to arbitration agreement assumed obligation to arbitrate when it purchased all of the assets of another company which had agreed to arbitrate with the claimant), *vacated in part on other grounds*, 322 F.3d 115 (2d Cir. 2003). Courts view a party's disavowal of arbitrability as evidence supporting a finding that the non-signatory has not assumed the agreement to arbitrate. *Thomson-CSF*, 66 F.3d at 777; *Stolt-Nielsen*, 2007 WL 194182, at *4 (quoting *Thomson-CSF*, 66 F.3d at 777); *Shaw Group*, 2001 WL 883076, at *2.

Here, the exchange of correspondence between CSCL and OWB China shows that the CSCL/OWB China Contract and the Big Port/OWB Far East Contract were agreed on the same day: September 25, 2014. The CSCL/OWB China correspondence does not include anything related to the separate agreement reached between Big Port and OWB Far East. Furthermore, CSCL has disavowed arbitrability since Big Port demanded arbitration. Therefore, the assumption theory also does not apply.

### 3.    Veil-Piercing/Alter Ego

There is no suggestion that the OW entities have a corporate relation to CSCL or that CSCL somehow controls or dominates them. Therefore, this theory likewise is inapplicable.

### 4.    Estoppel

The estoppel theory applies to situations in which a party that has agreed to the arbitration clause alleged to govern the dispute then seeks to avoid arbitration demanded by a third-party concerning that dispute. In other words, if CSCL had demanded arbitration (as a non-party to the Big Port/OW Bunker Far East Contract) and Big Port sought to avoid arbitration, CSCL could argue that Big Port should be estopped from avoiding arbitration because Big Port

had agreed to arbitrate disputes related to that transaction.  As explained by the Second Circuit, the reverse is not true:

> As these cases indicate, the circuits have been willing to estop a ***signatory*** from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.  ***As the district court pointed out, however, "[t]he situation here is inverse: E & S, as signatory, seeks to compel Thomson, a non-signatory."  While E & S suggests that this is a non-distinction, the nature of arbitration makes it important.***  Arbitration is strictly a matter of contract; if the parties have not agreed to arbitrate, the courts have no authority to mandate that they do so.  In the line of cases discussed above, ***the courts held that the parties were estopped from avoiding arbitration because they had entered into written arbitration agreements,*** albeit with the affiliates of those parties asserting the arbitration and not the parties themselves.  ***Thomson, however, cannot be estopped from denying the existence of an arbitration clause to which it is a signatory because no such clause exists.  At no point did Thomson indicate a willingness to arbitrate with E & S.  Therefore, the district court properly determined these estoppel cases to be inapposite and insufficient justification for binding Thomson to an agreement that it never signed.***

*Thomson−CSF*, 64 F.3d at 779 (emphasis added) (internal citation omitted).  The Second Circuit has continued to rely upon this distinction:

> ***[I]t matters whether the party resisting arbitration is a signatory or not***. *See Thomson–CSF*, 64 F.3d at 779.  "[A] court should be wary of imposing a contractual obligation to arbitrate on a non-contracting party . . . ."  *Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 97 (2d Cir. 1999); *see Choctaw Generation Ltd. P'ship v. Am. Home Assur. Co.*, 271 F.3d 403, 406 (2d Cir. 2001).  Thus a willing non-signatory seeking to arbitrate with a signatory that is unwilling may do so under what has been called an "alternative estoppel theory," *Thomson–CSF*, 64 F.3d at 779, which takes into consideration "the relationships of persons, wrongs and issues," *Choctaw*, 271 F.3d at 406.  But a willing signatory (such as Optibase) seeking to arbitrate with a ***non***-signatory that is unwilling (such as MLIM) must establish at least one of the five theories described in *Thomson–CSF*, 64 F.3d at 776–80.

*Merrill Lynch Inv. Mgrs. v. Optibase, Ltd.*, 337 F.3d 125, 131 (2d Cir. 2003) (first emphasis added, second emphasis in original).

Here, just as in the cases cited directly above, CSCL is a non-signatory to the Big Port

arbitration agreement.  Hence, Big Port cannot use estoppel as a basis to bind CSCL to its arbitration agreement, and the estoppel theory likewise is inapplicable.

**5.      Agency**

Big Port relies primarily on an agency theory (which then relies upon incorporation of Big Port's GT&Cs) to bind CSCL to arbitrate this dispute.  As stated in Big Port's arbitration demand:

> The contract was concluded between the Claimant [Big Port] ***and the Respondent's [CSCL's] agent*** and is contained in or evidenced by a Bunker Sales Confirmation dated 25th September 2014, ***signed by the Respondent's agent on behalf of the Respondent***, and the Claimant's general terms and conditions for sale of marine bunkers incorporated therein.

QQ Decl., Ex. 16 (Big Port's Demand for Arbitration), ¶ 2 (emphasis added).  Before turning to Big Port's argument that CSCL is bound to the arbitration clause contained in Big Port's general terms and conditions as a result of the acts of a purported agent, it is necessary to briefly review the law of agency.

**a.      Agency Law**

In 1990, The Second Circuit provided an excellent explanation of New York's law of agency in a maritime action:

> An express agency is created "by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account."  *Restatement (Second) of Agency* § 26 (1958) ("*Restatement*").   Whether such an agency is formed depends on the actual interaction between the putative principal and agent, ***not on any perception a third party may have of the relationship***.
>
> * * *
>
> Implied agency, in contrast, depends not on the actual relationship between principal and agent but on the reasonable conclusion of a third party, ***derived from actions of the principal***, that the person acting has authority to do so from the principal.  "[A]pparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him."  *Restatement* §

27.  Thus, in order to determine whether there was implied authority, ***the court must focus on the acts of the principal in relation to the third party***.

    Though plaintiffs argue that the actions of SCL reasonably led them to believe that SCL was AES Ltd.'s principal, the record refutes their claims.  Under New York law, "[o]ne who deals with an agent does so at his peril, and must make the necessary effort to discover the actual scope of authority."  Whatever the possibility that some of SCL's actions may have given outsiders the impression that AES Ltd. was running the AES line on behalf of SCL, the scope of any such implied authority plainly could not be deemed to have extended to the one set of AES Ltd. actions that is pertinent here, *i.e.,* the execution of the container leases. Both Itel and Flexi-Van, in the course of negotiating the leases with AES Ltd., communicated directly with SCL in an attempt to get SCL to take responsibility for the leases.  SCL flatly refused to do so.  Neither these plaintiffs nor Textainer (which does not appear to have communicated with SCL when negotiating its leases) point to any action by SCL that they could reasonably have interpreted as authorizing AES Ltd. to enter into the leases on behalf of SCL.

*Itel Containers Int'l  Corp. v. Atlanttrafik Exp. Serv. Ltd.*, 909 F.2d 698, 702-03 (2d Cir. 1990) (emphasis added) (case citations omitted).

As explained in the accompanying Koh Declaration, the law of agent and principal in Singapore follows similar principles.  Therefore, whether the issue is analyzed under New York law or Singapore law, the outcome should be identical.  The question presented is whether CSCL (1) manifested to OWB Far East that CSCL desired OWB Far East to act on CSCL's behalf (i.e., express authority), or (2) manifested to Big Port behavior that implied that CSCL had designated OWB Far East to act on CSCL's behalf (i.e., implied authority).  As discussed below, the record is devoid of evidence supporting either conclusion.

### b.  Big Port's Demand For Arbitration and Purported Agency Claim

Big Port's Demand for Arbitration (the "Demand") fails to provide proof of the existence of either an actual agency agreement between CSCL and OWB Far East or an implied agency created by CSCL's actions.

The Demand states that "Respondent's agent" concluded the bunkering agreement evidenced by the Big Port Sales Confirmation dated September 25, 2014.  The Big Port Sales

Confirmation dated September 25, 2014 identified OWB Far East as the "buyer" of the bunkers. There is no mention of CSCL by name on that Big Port Sales Confirmation. Furthermore, the Demand contains no evidence supporting the notion that CSCL and OWB Far East had an actual agency agreement. As can be seen by the exchanges of correspondence between CSCL and OWB China, CSCL never authorized OWB China to act as CSCL's agent; rather, CSCL simply sought to purchase bunkers from OWB China at an agreed price at an agreed location.

The Demand appears to suggest that Big Port was entitled to rely upon certain facts to assume that an agency agreement existed between OWB Far East and CSCL. Specifically, the Demand contains the following allegations:

1) "Shortly before 25th September 2014, the Claimant [Big Port] was contacted by Ms. Daria Kuznetsova, a bunker trader with OW Bunker Far East (Singapore) Pte Ltd (the "Respondent's agent"). Ms. Kuznetsova dealt with Mr. Maxim Verbin of the Claimant. The Respondent's agent had dealt with the Claimant in the past and was familiar with the Claimant's Bunker Sales Confirmations and its General Terms and Conditions. The Respondent's agent enquired into the possibility of a supply of marine bunker fuel by the Claimant to the Vessel at Kavkaz, Russia." QQ Decl., Ex. 16 (Demand), ¶ 7.

While Big Port summarily concludes that OWB Far East was CSCL's agent, none of the actions related in this passage support such an agency claim. There is no reference to the existence of an actual agency agreement. Furthermore, there is no mention of any action ***taken by CSCL*** which would lead Big Port to conclude that OWB Far East had the authority to act as CSCL's agent. Rather, Big Port speaks about its past history with OWB Far East and OWB Far East's familiarity with Big Port's documentation and terms. But these considerations are irrelevant to the agency analysis.

2) "On or about 25th September 2014, the terms of the Respondent's purchase and the Claimant's supply were settled. In response to the Claimant's request, the Respondent's agent on or about 30th September 2014 sent confirmation of the Respondent's purchase and its terms to the Claimant in the form of a Purchase Order

Confirmation . . . which stated that . . . (c) it was for the account of the Respondent's agent . . . ." *Id.* ¶ 8.

Big Port claims the transaction was "Respondent's purchase." Yet OWB Far East's Purchase Order Confirmation states that the purchase "was for the account of [OWB Far East]." The Purchase Order Confirmation also states that "[w]e are hereby pleased to confirm ***our nomination*** [i.e., OWB Far East's nomination] as follows" – there is no mention of CSCL and OWB Far East does not provide "as agents only" or similar language on the document.

3) "Beneath the details described above [in the Purchase Order Confirmation] were details given by the Respondent's agent on the commercial aspects of the supply." *Id.* ¶ 9.

This paragraph implies that OWB Far East had knowledge of CSCL's operations and, therefore, suggests that OWB Far East was CSCL's agent. The problem with this position is that anything that might be gleaned from the communications of OWB Far East − the purported agent − are irrelevant to the agency inquiry. The communications only would be relevant if Big Port was receiving those communications from CSCL, the alleged principal. There is a greater problem, however, with any implications that Big Port hopes will be made. That problem is simple. The instructions listed at the bottom of the Purchase Order Confirmation ***were not instructions received from CSCL***. Rather, comparing the language in the Purchase Order Confirmation to the language in the email correspondence from Big Port to OWB Far East on 24-26 September 2014 and the Bunker Sales Confirmation dated September 25, 2014 shows that the terms referenced by Big Port in the Demand all were conditions that ***Big Port*** (not CSCL) had conveyed to OWB Far East.

4) "On 30th September 2014, in reply to the Respondent's agent's e-mail the same day, the Claimant sent to the Respondent's agent a Bunker Sales Confirmation dated 25th September 2014, copy herewith, stating that . . . (c) it is for the account of the Respondent's agent and the Respondent, the Vessel, and other persons on a joint and several basis, and that 'Buyer orders the bunker on behalf of the registered legal

owners [,].' with the sale JOINTLY AND SEVERALLY [to the account of] MV XIN
CHANG SHU, HER MASTER[,] OWNERS, MANAGERS, MANAGING
OWNERS, OPERATORS, DISP[O]NENT OWNERS, CHARTERERS AND
AGENTS." *Id.* ¶ 11.

Big Port states that its Bunker Sales Confirmation dated September 25, 2014 was not sent to
OWB Far East until after Big Port received the Purchase Order Confirmation from OWB Far
East dated September 30, 2014. Big Port provides no explanation why a document addressed to
OWB Far East and dated September 25, 2014 would not be sent until September 30, 2014. Big
Port also does not provide any evidence that these documents were exchanged out of date
sequence. Additionally, once again Big Port was exchanging communications with a purported
agent, which communications are irrelevant for the purpose of establishing an agency
relationship between OWB Far East and CSCL. While the Demand emphasizes that its Bunker
Sales Confirmation contained "a term that stipulated that the Respondent's agent ordered the
marine bunker fuel on behalf of the registered owners of the Vessel," *id.* ¶ 12, any confirmation
received by the purported agent OWB Far East is legally insignificant.

   5) "By signing and stamping the Bunker Sales Confirmation, the Respondent's agent
      accepted the terms of the contract or agreement and, in doing so, confirmed that it
      was acting for and on behalf of the Respondent in ordering the marine bunker fuel
      and that it had the authority to commit the Respondent to an obligation to pay for the
      marine bunker fuel when it was supplied by the Claimant and to a liability to the
      Claimant if the Respondent failed, refused or neglected to pay." *Id.* ¶ 17.

As CSCL quoted above, "[o]ne who deals with an agent does so at his peril, and must make the
necessary effort to discover the actual scope of authority." *Ford v. Unity Hospital*, 32 N.Y.2d
464, 473, 346 N.Y.S.2d 238, 244 (1973). The fact that OWB Far East claimed to have authority
is irrelevant and cannot serve to bind CSCL, an utter stranger to the Big Port/OWB Far East
Contract. While Big Port claims in the next paragraph of its Demand that "[a]t no time before,
during, or after the conclusion of the contract for the supply of marine bunker fuel did the

Respondent's agent say to the Claimants that it was not authorized to transact business on behalf of the Respondent," QQ Decl., Ex. 16, ¶ 18, this argument seeks to disclaim any responsibility for Big Port to determine with whom it actually is contracting.  The law of agency does not permit Big Port to rely upon the facts it has recited.

6) "On 1st November and 2nd November 2014, the two barges completed supplying the marine bunker fuel to the Vessel.  The Vessel's Master or Chief Engineer, applied to the bunker delivery receipts, copies herewith, the stamp and seal of Respondent, and signed each bunker delivery receipt, accepting the supply for and for the the [*sic*] account of the Respondent and the Vessel." *Id.* ¶ 19.

This paragraph is the only paragraph in the Demand that actually refers to conduct arguably attributable to CSCL.  Review of the bunker delivery receipts, however shows that (a) the name of Big Port is nowhere to be found, (b) reference to Big Port's GT&Cs is nowhere to be found, and (c) reference to an arbitration agreement is nowhere to be found.  In other words, the documents related to the delivery of the bunkers contained no reference to Big Port and, most significantly for the present motion, no mention of arbitration.  In fact, the actual physical supplier was an entity named TTK, not Big Port.

c.    **Agency Analysis**

The Demand contains many details regarding Big Port's interaction with OWB Far East, but provides no evidence of any interaction with CSCL.  There is no agreement between CSCL and OWB Far East by which CSCL expressly appointed OWB Far East as CSCL's agent.  The reason for this is simple:  CSCL and OWB Far East never corresponded on this transaction.

Similarly, there is no conduct of CSCL to which Big Port can point as evidence that CSCL led Big Port to believe that OWB Far East was CSCL's agent.  Big Port tries to bootstrap its claims against CSCL by reciting its past history with OWB Far East and that OWB Far East never told Big Port that OWB Far East was not authorized to bind CSCL.  But these statements

are legally irrelevant to the agency inquiry.

Moreover, OWB Far East itself has confirmed that it had contracted as a principal with Big Port and OWB China, respectively.  Hence, the entity which Big Port claims was CSCL's agent has denied that such an agency relationship existed and that it had no direct relationship with CSCL.  Rather, OWB Far East's "upstream" contract counterparty was OWB China.

Big Port can call OWB Far East "Respondent's agent" as many times as it would like; that does not make it so.  Big Port's allegations show that no agency relationship existed or could be implied, hence there can be no agreement to arbitrate imputed to CSCL as a result of an agent's activities.

## CONCLUSION

CSCL has shown that it will suffer irreparable harm if forced to arbitrate a dispute that it has not agreed to arbitrate.  It likewise has shown that it is likely to prevail on the merits of this dispute, as there is no arbitration agreement signed by CSCL and Big Port's agency argument is woefully lacking in any conduct by CSCL (the alleged principal) that could serve to create an agent-principal relationship will OWB Far East.  A party which seeks to arbitrate a dispute with another party has the burden of proving arbitrability.  Here, that burden has not been, and cannot be, met.  There is no contractual agreement between Big Port and CSCL to arbitrate.  Nor is there an agreement between Big Port and CSCL with respect to anything else.

Turning to Big Port's allegations that OWB Far East was CSCL's agent, there is no express agency agreement between CSCL and OWB Far East, as CSCL never communicated with OWB Far East regarding this transaction.  There is likewise no implied agency agreement, because Big Port received nothing from CSCL (the alleged principal and the key player in any

implied agency analysis) that could reasonably lead Big Port to conclude that OWB Far East was authorized to act as CSCL's agent.

There is no arbitration agreement that is present between CSCL and Big Port.  Likewise none of the conditions present exist which would permit the Court to bind non-signatory CSCL to Big Port's arbitration agreement.  Therefore, CSCL respectfully requests that the Court grant CSCL's motion for a preliminary injunction staying the New York arbitration from proceeding forward, and order that Big Port pay CSCL its reasonable costs and attorneys' fees resulting from Big Port's demand of arbitration and its Singapore application.

Dated: March 13, 2015
        New York, New York

                                    Respectfully submitted,

                            By: _____
                                    Michael J. Frevola
                                    K. Blythe Daly
                                    HOLLAND & KNIGHT LLP
                                    31 West 52nd Street
                                    New York, NY 10019
                                    Telephone:  (212) 513-3200
                                    Facsimile:  (212) 385-9010
                                    Email: michael.frevola@hklaw.com
                                            blythe.daly@hklaw.com

                                    Attorneys for Petitioner,
                                    *China Shipping Container Lines Co. Ltd.*